IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. CR 19-0059 CJW |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| RAVEN DAMIEN MEADER BURKHOW, ) | |
| ) | |
| Defendant. ) | |

Sentencing Memorandum

I.   BACKGROUND .................................................................................................2

II.  SENTENCING GUIDELINE ISSUES ...............................................................6

    A. Unlawful User of Controlled Substances ......................................................6

    B. Trafficking of Firearms..................................................................................8

    C. Use or Possession of Firearm in Connection with another Felony
       Offense ...........................................................................................................9

    D. Role in the Offense.......................................................................................11

III. FINAL SENTENCING GUIDELINE CALCULATION ..................................14

IV.  SPECIAL CONDITION OF RELEASE............................................................14

V.   MOTION FOR DOWNWARD VARIANCE.....................................................14

    A. Personal History and Characteristics .........................................................15

    B. Military Service.............................................................................................17

VI.  DEFENDANT'S EXHIBITS AND WITNESSES .............................................18

I.    Background.

The defendant is 26 years old. PSR, Identifying Data. The defendant's adult criminal history consists of one citation for staying after-hours in a Linn County park. PSR, paragraph 58. He has 0 criminal history points.

The defendant pleaded guilty to six federal crimes: one count of conspiracy to distribute 500 grams or more of cocaine; three counts of use and possession of a firearm during and in relation to and in furtherance of a drug trafficking crime; one count of possession of machine guns; and, one count of possession of a National Firearms Act Firearm (pipe bomb).

The defendant primarily sold ounce quantities of cocaine. PSR, paragraph 7. He started selling cocaine on or about July 2018. PSR, paragraph 5. He suffered a shoulder injury while lifting weights in April 2018. The injury required surgery. PSR, paragraph 69. Due to his injury, he was incapable of working in his profession (welding). Instead of going on unemployment or accepting public benefits, the defendant unfortunately decided to financially support himself by selling cocaine.

The evidence will show that the defendant had an avid interest in firearms. The defendant had this interest since he was a young boy. The evidence will show that the defendant comes from a family of hunters (his mother's side of the family), and he was always around hunting and firearms as a youngster. He learned to hunt and shoot from his maternal grandfather, maternal uncles, and his mother. (The defendant's father had very little

2

involvement in the defendant's upbringing. PSR, paragraph 65.)

When the defendant was 17 years old, in the summer of 2012, he entered the military. PSR, paragraph 82. The defendant obtained a special waiver in order to enlist when he was only 17-years old. One of his primary motivations for entering the military was to be around firearms, specifically, large caliber and automatic firearms. After he successfully completed basic training, the defendant completed a full-term of military service. *Id*. During his service, he was assigned to Infantry, where he could work with and shoot large caliber firearms.

In 2018, as the defendant sold more cocaine, and made more money, he began to legally purchase firearms of all sorts (the defendant possesses an Iowa permit to purchase and carry firearms). The defendant's practice was to own the firearms for a few months, and then trade them in for different firearms. He avidly attended gun shows in Iowa.

At one of the gun shows, the defendant met Mr. Robert Folkestad. Mr. Folkestad is the founder and owner of Creative Werks, Inc., an electronics manufacturing business in Des Moines, Iowa, and Creative Arms LLC, a limited liability corporation in Des Moines that manufactures and sells firearms. Mr. Folkestad has a federal firearms license (FFL).

Mr. Folkestad and the defendant struck a friendship. Folkestad, in his mid-50s, took on the role of a mentor and father-figure to the defendant. (As noted above, the defendant's biological father had very little involvement in

3

defendant's upbringing.) Folkestad was active in advising and encouraging the defendant in many areas of defendant's life, such as pursuing a pilot's license (Folkestad also has a pilot's license and is a co-owner of a plane), and purchasing gold and bitcoin as alternative assets. He also encouraged defendant to start a business of selling 80% firearms.

Folkestadt also encouraged the defendant to convert semi-automatic firearms to fully-automatic, and to sell illegal silencers. The evidence will show that the defendant purchased semi-automatic firearms with the intent to convert them to fully automatic. The person that could make that happen was Folkestad. Folkestad introduced the defendant to Robert Miller, another Des Moines resident, who also had the necessary expertise in converting guns to fully automatic.

Miller, Folkestad, and the defendant conspired to illegally manufacture fully-automatic firearms. PSR, paragraph 11; Plea Agreement, Paragraph 26(V). The defendant also obtained several illegal silencers from Folkestad.

On March 14, 2019, the defendant sold to the CI a semi-automatic handgun equipped with a silencer and one ounce of cocaine. PSR, paragraph 15. On April 23, 2019, Folkestad made silencers, and Miller converted firearms into fully-automatic for the defendant. PSR, paragraph 19. On the same date, the defendant sent videos to the CI showing defendant firing one of the fully automatic firearms. PSR, paragraph 20. The videos were taken

4

by Folkestad (using defendant's cell phone) and sent from Folkestad's business in Des Moines.

Six days later, on April 29, 2019, the defendant sold one of the fully-automatic firearms equipped with a silencer and one ounce of cocaine to the same CI. PSR, paragraph 22. The transaction occurred outside of the defendant's residence in Cedar Rapids. The CI was working with law enforcement and immediately turned over the purchased firearm and cocaine to law enforcement. Shortly after the transaction, the defendant was arrested without incident.

Law enforcement obtained a search warrant for defendant's residence and car. In the residence—a one bedroom apartment in downtown Cedar Rapids—were many firearms. There were also silencers, cocaine, drug paraphernalia, CBD, and a large amount of cash. A pipe bomb, as defined by the National Firearms Act, was also located by law enforcement. The "pipe bomb"—as constructed by the defendant – was a 1.5 inch diameter, 6 inch PVC pipe filled with tannerite[1] (a powder that is used for firearms practice and sold in kit form) with a large firecracker attached to the pipe with a rubber band.

Law enforcement obtained a search warrant for the defendant's urine.

---

[1] Tannerite is "relatively stable when subjected to forces less severe than a high-velocity bullet impact. A hammer blow, being dropped, or impact from a low-velocity bullet or shotgun blast will not initiate a reaction. It is also designed to be non-flammable, although its explosion can cause other flammable material to ignite." https://en.wikipedia.org/wiki/Tannerite.

5

On May 1, 2019, the defendant provided a urine sample which was tested for the presence of controlled substances. The sample came back negative for all controlled substances.

II. Sentencing Guideline Issues.

The United States Probation Office has identified four outstanding Sentencing Guideline issues.

A. Unlawful User of Controlled Substances.

Regarding paragraph 45 of the PSR, because the defendant was not an unlawful user of controlled substances at the time he committed the instant offense, the correct base offense level is 18. See, USSG 2K2.1(a)(5).

The phrase "unlawful user of ... any controlled substance" in 18 U.S.C. § 922(g)(3) is not defined by statute and "runs the risk of being unconstitutionally vague without a judicially-created temporal nexus between the gun possession and regular drug use." *United States v. Turnbull*, 349 F.3d 558, 561 (8th Cir. 2003). Courts have thus created a requirement that there be a temporal nexus between a defendant's possession of a firearm and the defendant's drug use. The government must prove defendant was a regular user of drugs at the time he possessed the firearm. *Turnbull*, 349 F.3d at 561.

In the case at bar, the evidence shows the defendant was arrested on April 29, 2019. On April 30, 2019, law enforcement obtained a search warrant for defendant's urine sample. *In the Matter of the Search of Raven*

*Damien Meader Burkhow,* Case No. 19-MJ-148, N.D. Iowa. The warrant was executed on May 1, 2019. The defendant's urine sample, as tested by the Iowa DCI Criminalistics Laboratory, tested negative for all controlled substances.

The defendant has offered to take a polygraph examination regarding his lack of drug use – up to this point in time, the government has not accepted the defendant's offer. The defendant has also requested the government reach out to the CI involved in the instant case, as during the offense conduct, the CI asked the defendant to use cocaine—the defendant refused. It is unknown whether the government has interviewed the CI regarding defendant's lack of drug use.

The evidence also shows that the defendant's former girlfriend Sadie Anderson was interviewed by ATF Agents on May 1, 2019. When questioned concerning defendant's drug use, Ms. Anderson stated that the defendant was "super sober". ATF_ROI-000161. Ms. Anderson was asked if the defendant "smoked pot". Audio recording of Anderson interview, 7:23 mark. She stated that defendant did not. (She admitted that *she* used marijuana.)

The defendant concedes there is ample evidence of drug use in the defendant's apartment, however, the drug use was by others. Not the defendant. He has not used drugs since he was 17 years old. He was not an unlawful user of controlled substances at the time of the instant offense.

The Probation Office notes that at the time of his arrest, and at the

7

time of his pretrial services interview, the defendant stated that he was a drug user. PSR, paragraph 26. The defendant was not truthful during these interviews. He has not used illegal controlled substances since he was 17 years old. There is no witness that will testify that they ever saw defendant use drugs.

    B.    Trafficking of Firearms.

Pursuant to USSG Section 2K2.1(b)(5) ("If the defendant engaged in the trafficking of firearms increase by 4 levels."), the Probation Office has scored the trafficking enhancement. PSR, paragraph 45. The defendant objects.

USSG 2K2.1, application note 13, reads:

(A) In General.—Subsection (b)(5) applies, regardless of whether anything of value was exchanged, if the defendant—

> (i) transported, transferred, or otherwise disposed of two or more firearms to another individual…; *and*,
>
> (ii) knew or had reason to believe that such conduct would result in the transport, transfer, or disposal of a firearm to an individual—
>
> (I) whose possession or receipt of the firearm would be unlawful; or
>
> (II) who intended to use or dispose of the firearm unlawfully.
>
> (B) Definitions.—For purposes of this subsection: "Individual whose possession or receipt of the firearm would be unlawful" means an individual who (i) has a prior conviction for a crime of violence, a controlled substance offense, or a misdemeanor crime of domestic violence; or (ii) at the time of the offense was under a criminal justice sentence, including probation, parole,

8

supervised release, imprisonment, work release, or escape status. "Crime of violence" and "controlled substance offense" have the meaning given those terms in §4B1.2 (Definitions of Terms Used in Section 4B1.1). "Misdemeanor crime of domestic violence" has the meaning given that term in 18 U.S.C. § 921(a)(33)(A).

There is no evidence that the persons to whom defendant sold firearms, including the CI, satisfied the above criteria. Even if there were such evidence, there is no evidence that defendant was aware of such status of the purchasers of the firearms. The trafficking enhancement does not apply. *See, United States v. Steven Arce,* NDIA Case No. 19-CR-2005 CJW.

In *Arce*, Steven Arce sold firearms to a CI who made it known to Arce that the CI was a convicted felon. Arce pleaded guilty to the offense of sale of a firearm to a felon. USSG Section 2K2.1 applied to the case (just as in the instant case).

In a plea agreement, the parties agreed to the four level trafficking enhancement. Despite the stipulation of the parties to the enhancement, the Court (The Honorable Judge C.J. Williams) determined that because the government could not prove that the Arce knew that the CI had a prior felony conviction for a crime of violence or controlled substance offense, the enhancement did not apply.

C. Use or Possession of a Firearm In Connection with Another Felony Offense.

The parties have agreed that the four-level enhancement set forth in USSG Section 2K2.1(b)(6)(B) applies to the instant case—that defendant

9

used or possessed the firearms in connection with another felony offense. Plea Agreement, paragraph 29(I). Specifically, the parties agreed that defendant's use or possession of the firearms violated Iowa Code Section 724.4 (carrying weapons), Iowa Code Section 724.1B (unlawful possession of firearm suppressor), and other offenses under the National Firearms Act (NFA).

The Probation Office has scored the enhancement. PSR, paragraph 45. However, the Probation Office noted that "absent the parties' plea agreement stipulation related to the application of a four-level upward adjustment…the probation office would not have applied the aforementioned enhancement."

The defense urges the Court to follow the plea agreement of the parties. The parties negotiated the plea agreement in good-faith and each party received a "benefit of the bargain" from said agreement. The defendant received significant concessions from the government (i.e., reducing the mandatory minimum sentence from 95 years to 25 years) in return to his agreement, in part, to the four-level enhancement. While the Probation Office makes very good points in regards to the legal application of the enhancement, the defense knowingly and voluntarily entered into the plea agreement with full knowledge of its consequences. The four-level enhancement is correctly applied in this case.

10

D. Role in the Offense.

The government seeks a two-level enhancement based on "the defendant was an organizer of firearm activity; the defendant acted as a source of supply for drugs and multiple firearms; the defendant determined the supply for drugs and multiple types of firearms; the defendant determined the supply of firearms and drugs and set prices for their sale; the defendant met with Robert Folkestad and Robert Miller in Des Moines and directed them in the manufacturing of unregistered machine guns and silencers for him; and the defendant distributed drugs and guns knowing others would sell some of the drugs and firearms." PSR, paragraph 48 (government Objection No. 22).

The Probation Office did not apply the role enhancement. ("…the probation office believes that the evidence in this case does not reflect that the defendant directed another individual to the extent necessary to be considered an organizer, leader, manager, or supervisor as related to drug and firearm-related conduct.") PSR, paragraph 48.

In regards to the drug activity of defendant, the evidence shows that the defendant acted on his own. He supervised and managed no one. While it is true that the defendant distributed drugs knowing that others would sell some of the drugs, that constitutes a conspiracy but not an aggravating enhancement.

Regarding the firearm offenses, the defendant never managed or

11

supervised Folkestad or Robert Miller. Folkestad was a mentor to the defendant. Folkestad had sophisticated business and firearms knowledge. Robert Miller showed the defendant the process in which to convert firearms or silencers.

As set forth above, the defendant met Folkestad at a gun show in Cedar Rapids. At the time of the offense conduct, the defendant was 24 years old with an alternative school education; Mr. Folkestad is in his 50s. Folkestad is the founder and owner of Creative Werks, Inc., and Creative Arms LLC. He has a federal firearms license (FFL).

According to an interview of Mr. Folkestad, (ATF_ROI-000108), Christina Folkestad (his wife) is a lawyer and is responsible for all compliance and recording issues for the FFL of Creative Arms LLC.

Shortly after the arrest of the defendant, federal law enforcement executed a search warrant at Creative Arms on April 30, 2019. Robert Folkestad was present at Creative Arms during the search. He gave a consensual interview to the ATF.

Robert Miller (age 62) worked for Folkestad converting semi-automatic firearms into fully automatic. On May 15, 2019, Miller provided the following information in an interview with the ATF:

> MILLER stated that on the Saturday after ATF served a warrant on FOLKESTAD'S business FOLKESTAD called him on the phone. MILLER believed that FOLKESTAD was in Texas when he spoke with him. *MILLER stated FOLKESTAD said to put this all on BURKHOW and say that we just coached him how to do it.*

> MILLER stated he received another phone call from FOLKESTAD on Monday May 6 2019 around 8:00 PM or so. MILLER stated that FOLKESTAD proposed that they get together in person and not talk over the phone. MILLER stated they agreed to meet at Bailey's Bar the following day.
>
> MILLER stated on May 7 2019 FOLKESTAD and he met at Bailey's Bar at 1:00 PM. MILLER stated he felt like FOLKESTAD was gauging his temperature on the whole thing and making sure their alliance was still intact. *MILLER stated FOLKESTAD offered to give MILLER money if he needed an attorney. MILLER stated FOLKESTAD again told MILLER to keep with the story that they "coached" BURKHOW on the 80%ers.* MILLER added that he recalled a conversation he had with FOLKESTAD the day that BURKHOW was at Creative Arms that *FOLKESTAD said if BURKHOW ever got him in hot water that FOLKESTAD would kill BURKHOW.*

ATF_ROI-000325 (emphasis added).

Folkestad encouraged the defendant to sell Glocks with silencers and fully automatic firearms. Folkestad was also active in advising and encouraging the defendant in other areas of defendant's life.

It can be argued that Folkestad (not the defendant) was the organizer of the conspiracy. He introduced Miller to the defendant. He provided his business-place as the location where the firearms were converted to fully-automatic. He supplied all of the guns, silencers, and parts necessary to convert firearms. He provided the necessary machinery (lathes) for the conversion of firearms. He offered to pay the legal fees to Miller after Miller was questioned by the ATF. He encouraged Miller to falsely tell law enforcement that Folkestad's role was merely as a "coach". And, Folkestad stated to Miller that Folkestad would have the defendant killed.

13

III. Final USSG Sentencing Recommendation.

The defendant's base offense level is 18, plus 6 for number of firearms, plus 2 for a destructive device, plus 4 for the use or possession of firearm in connection with another felony offense, plus 2 for money laundering, and minus 3 for acceptance of responsibility. The total offense level is 29. The defendant has 0 criminal history points, which places him in Criminal History Category I. Accordingly, the defendant's recommended Sentencing Guideline range for Counts 1, 12, and 29 is 87 – 108 months. Count 1 has a 60 month mandatory minimum, The Guideline sentence must run consecutive to the twenty year mandatory sentence of Counts 8, 9, and 10.

IV. Special Condition of Release.

The defendant objects to the special conditions of release set forth in paragraph 103 – "defendant must participate in a substance abuse evaluation…defendant must complete any recommended treatment program…the defendant must participate in a program of testing for substance abuse." The defendant's objection is based upon the fact that he has not used any controlled substance for approximately 9 years (since he was 17 years old).

V. Motion for Downward Variance.

The defendant's recommended Guideline range for Counts 1, 12, and 29 is 87 – 108 months. The final range (assuming the Court grants

14

defendant's objection to the 2 level and 4 level Guideline enhancements) is 327 – 348 months.

The defendant moves for a downward variance to the 300-month mandatory minimum. This would be a downward variance from 27-48 months depending on where within the Guideline range the defendant is sentenced.

    A.    History and Characteristics of Defendant.

The defendant moves for a downward variance for two reasons. First, the history and characteristics of the defendant.

Despite having little criminal history (the only criminal history is a citation for staying too late in a public park), the defendant is facing an extremely long prison sentence, even when considering the possible downward variance. The defendant has told the undersigned that one of his biggest fears is not being able to have a family due to a long prison sentence. The defendant currently has no children. He very much wants to be a father. He is 26 years old. Assuming he receives the mandatory minimum 25-year sentence, he will be released in his mid-to-upper 40s.

The defendant has made a horrible mistake. However, as grave as the mistake is, there is no evidence (that the defense is aware of) that any of the firearms sold by the defendant have been used in any further criminal activity.

15

A factor that has haunted the defendant is the fact that he grew up with a very negative influence of his father. It is difficult enough to lack a father's companionship and positive influence; it is even more difficult to have a father who is a destructive influence.

Fortunately, the defendant enjoys the support of his mother and her side of the family. As his letters of support indicate, the defendant is very close to his mother and her side of the family. Upon his release, the defendant will have solid family support that will be very helpful for rehabilitation. A defendant's continuing family support and affection is a proper factor when determining whether a downward variance is appropriate. See, *United States v. Beiermann*, 599 F.Supp.2d 1087 (N.D. Iowa 2009). In *Beiermann*, the sentencing court held that the continued support and affection of a defendant's immediate family "suggests that this defendant is redeemable and will have significantly greater support than usual in his efforts at rehabilitation". *Id*. at 1112-13.

Also, the defendant has been an active member of his church. As Pastor Cecil Ballard noted in his letter of support, the defendant is solely responsible for two families becoming members of the Grace Baptist Church in Marion, Iowa.

Finally, in its letter of objections to the draft presentence report, (DCD 143, p. 1) the government comments regarding the tattoos of defendant including "Proud Boy" and "Deus Vult". The government cites the Southern

16

Poverty Law Center as indicating the defendant's tattoos signify that he is a member of a "hate group".

The defendant is not a member of a hate group, nor does he possess any philosophies of a hate group. First, it is important to note that the Southern Poverty Law Center ("Center") currently includes the Immigration & Customs Enforcement ("ICE") as a "hate group". The Center claims that ICE officers "have illegally and unfairly apprehended immigrants with disregard for their rights." The Center, on October 21, 2020, under their website's link called "Hate Watch", also allege that the administration of President Donald J. Trump has ties to "hate groups". See, https://www.splcenter.org/hatewatch/2020/10/21/trump-official-brought-hate-connections-white-house (last accessed October 27, 2020).

Second, the "Deus Vult" tattoo comes directly from the defendant's time of service in the military. The evidence will show that Deus Vult was the slogan of the defendant's Alpha-19 company. African-American members of the Alpha-19 company have the same tattoo.

B. Prior Military Service.

Second, the defense brings the defendant's prior military service to the attention of the Court. The defendant enlisted in the military when he was 17-years old. He received an Honorable Discharge from active duty. See, *Porter v. McCollum*, 558 U.S. 30, 130 S.Ct. 447, 455 (2009) ("Our Nation has

17

a long tradition of according leniency to veterans in recognition of their service…").

VI. Defense Witnesses and Exhibits.[2]

**Exhibits** –

A - Letter(s) of support (to be filed separately).

B – Iowa DCI Toxicology Report

C – photo of defendant and Solomon Carlson

D – ATF interview report of Sadie Anderson, marked as ATF_ROI-000161

**Witnesses** –

Robert Miller

Solomon Carlson

Amos L. Burkhow

Respectfully submitted,

/s/ Raphael M. Scheetz
Raphael M. Scheetz
425 2nd Street S.E.
Suite 1010
Cedar Rapids, Iowa 52401
319-378-7416
scheetzlaw@aol.com
ATTORNEY FOR DEFENDANT

---

[2] The defendant has asked that his medical issues be brought to the attention of the Court – he believes that he tore his meniscus in his knee while in custody at the Fayette County Jail; he has a growing lump in his chest; he continues to suffer pain in his shoulder; and, he continues to have pain in his hip from his time in the military (he is working with the VA regarding his hip pain).

18

19